**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

ROOSEVELT C.,

*Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_________________________________/

Case No. 1:26-cv-10950

Patricia T. Morris
United States Magistrate Judge

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 7, 9)**

## I. CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 7) is **DENIED**, the Commissioner of Social Security's motion for summary judgment (ECF No. 9) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II. ANALYSIS

### A. Introduction and Procedural History

On June 26, 2023, Plaintiff filed an application for supplemental security income, alleging disability beginning that same day. (ECF No. 4-1, PageID.56). The Commissioner initially denied the application on February 2, 2024, and on

reconsideration on July 22, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on April 1, 2025. (*Id.*). The ALJ issued a written decision on June 5, 2025, finding Plaintiff was not disabled. (*Id.* at PageID.56–66). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on January 22, 2026. (*Id.* at PageID.47–49).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on March 23, 2026. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 6). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 7, 9).

**B. Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means

only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 4-1, PageID.66). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since June 26, 2023, the application date. (*Id.* at PageID.58). At step two, the ALJ found the following severe impairments: coronary artery disease and COPD. (*Id.*).

At step three, the ALJ found the impairments, individually or in combination, did not meet or medically equal in severity or duration the criteria of any listing. (*Id.*

at PageID.61). Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 416.967(b) except he can occasionally climb ramps or stairs. He can have occasional exposure to extreme heat, to humidity, and to dust, odors, fumes, and pulmonary irritants.

(*Id.* at PageID.61).

At step four, the ALJ found Plaintiff did not have any past relevant work. (*Id.* at PageID.64). However, at step five, the ALJ found other jobs in the national economy Plaintiff could perform. (*Id.* at PageID.65–66). Specifically, the ALJ found Plaintiff could perform the requirements of a marker (165,000 jobs in the national economy), a routing clerk (122,000), and a router (10,000). (*Id.*). The ALJ thus concluded Plaintiff was "not disabled." (*Id.* at PageID.66).

**E. Administrative Record**

Plaintiff raises one issue on appeal. He argues the ALJ erred by failing to properly evaluate medical opinions. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issue on appeal.

Plaintiff has a history of hypertension and hypertensive cardiovascular disease. (ECF No. 4-1, PageID.537). In August 2023, Plaintiff presented to the hospital with chest discomfort that had been ongoing for six days. (*Id.* at PageID.470). An EKG showed he was having a heart attack, and he was immediately taken to the cardiac catheterization lab where he received two stents. (*Id.* at PageID.470, 478). He was prescribed aspirin and Brilinta and continued on a

statin. (*Id.*). He was also counseled on the importance of quitting smoking. (*Id.*). The next day, he left the hospital against medical advice after becoming upset when he was told to stop swearing on the phone. (*Id.* at PageID.470).

Plaintiff presented for a follow up in September 2023. (*Id.* at PageID.464). He reported doing "a lot better" than before the stents and complained of no chest discomfort. (*Id.*). His only complaint was sometimes getting a rapid heart rate which he attributed to anxiety.[1] (*Id.*). The doctor noted no heart-failure symptoms and physical exam was normal. (*Id.*). A 48-hour heart monitor showed normal sinus rhythm with normal heart rate distribution, only rare extra heartbeats, and no significant arrhythmias. (*Id.* at PageID.477, 524). In October 2023, Plaintiff denied chest pain at rest or with exertion, shortness of breath, or palpitations. (*Id.* at PageID.529). A transthoracic echo report was mostly normal with normal ejection fraction of 65%. (*Id.* at PageID.503).

Plaintiff again followed up in December and reported feeling well overall:

> He states he has been noncompliant at times with his medications in which he states he does develop chest pressure when he stops taking them. As soon as he resumes his medications he states he feels very well. This has happened on 2 occasions. He denies any current anginal

---

[1] Although anxiety is mentioned in other records the Court summarizes, Plaintiff does not challenge the ALJ's mental findings so his anxiety need not be further discussed. Similarly, Plaintiff does not challenge the ALJ's finding that his musculoskeletal pain was not a medically determinable impairment or argue the ALJ did not consider his non-medically determinable impairments in crafting the RFC and the Court will not further discuss this or other similar evidence not challenged on appeal. Finally, many of the records are duplicative and they will not be cited multiple times.

symptoms, no heart failure symptoms.

(*Id.* at PageID.524). Physical examination was normal. (*Id.*).[2] Although he reported in September 2023 that he quit smoking after his surgery, he reported in October and December 2023 that he continued to smoke and he was still smoking at his June 2024 follow up despite "extensive[]" counseling to cease. (*Id.* at PageID.525, 527, 530–31, 583).

In June 2024, Plaintiff reported no chest pain at rest or with exertion and no shortness of breath or palpitation. (*Id.* at PageID.583). In July, Plaintiff returned for a follow up:

> Since his heart attack, he has been faring well. He occasionally experiences chest pain, which he does not associate with a heart attack. He discontinued all his medications six months ago, missing them for about a week and a half due to an out-of-town trip. However, he resumed his medication upon his return. He describes a sensation of heaviness and squeezing in his chest when ascending stairs, which resolves after rest. This issue has been ongoing since his heart attack.

(*Id.* at PageID.903). The doctor ordered a stress test. (*Id.*). During the test, Plaintiff experienced some chest discomfort that spontaneously resolved, but there were no ischemic ECG changes or arrythmias. (*Id.* at PageID.910). The report showed a reduced blood flow during stress in the right coronary artery, but Plaintiff's ejection fraction was still within the normal range, at 57%. (*Id.* at PageID.695, 943).

---

[2] Throughout treatment post-hospitalization, Plaintiff's physical exams were generally normal. (*See, e.g.*, ECF No. 4-1, PageID.527, 530, 533, 535, 538, 570–71, 578, 584, 904, 953–54).

At a September 2024 follow up for chronic chest discomfort, Plaintiff's doctor found plaque buildup in his posterior descending artery. (*Id.* at PageID.948). His physical exam was normal. (*Id.* at PageID.948–49). Plaintiff's doctor continued him on aspirin and Brilinta and added a medication to prevent chest pain. (*Id.* at PageID.949). In December, Plaintiff reported an improvement in his chest pain on this medication. (*Id.* at PageID.953).

Other evidence will be discussed below as necessary.

**F. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

> (i) A licensed or certified psychologist at the independent practice level; or
>
> (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

> (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;
>
> (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;
>
> (5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to:

(1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical

finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many

> types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally

persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe impairment(s);

> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all

of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;
>
> (vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason

is very risky for [the claimant]; or

(5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

**G. Argument and Analysis**

As stated above, Plaintiff argues the ALJ erred by failing to properly evaluate the supportability and consistency factors of several medical opinions.

As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion. *Id.* § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). Importantly,

> The new regulation substantially reduces the ALJ's obligation to explain the basis for his or her assessment of medical opinions:
>
>> [Source-level articulation.] Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (quoting 20 C.F.R. § 404.1520c(b)(1)); *see also Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. 2022) ("Even for a medical opinion, there is no requirement to cite to every piece of evidence or conclusion.").

Plaintiff's physician, Dr. Mohamed Ali, filled out a medical source statement in March 2025. (ECF No. 4-2, PageID.992–96). In addition to symptoms not at issue in this appeal, Dr. Ali noted Plaintiff has chest pain and opined that his symptoms would frequently interfere with his attention and concentration at work and that he was only able to walk one block. (*Id.* at PageID.992–93). Dr. Ali also

opined Plaintiff could not sit or stand for more than 10 minutes at a time and could only sit or stand for two hours each in an eight-hour workday. (*Id.* at PageID.993–94). Additionally, Plaintiff would have to walk for one minute after every 15 minutes; needed a sit/stand option at work; would need a 15-minute break from work every hour; would need to elevate his legs for 90% of every workday; could occasionally lift up to 20 pounds; could never climb ladders or stairs; and would need to be absent four days a month. (*Id.* at PageID.994–96).

Plaintiff argues the ALJ's reasoning, block-quoted below, inadequately discussed the supportability and consistency factors in finding this opinion unpersuasive:

> The claimant's treating physician opined that the claimant had lifting and carrying restrictions consistent with light work, yet had debilitating ambulatory, postural, manipulative, and other limitations that would effectively prevent him from sustaining a full-time or equivalent work schedule on a regular and continuing basis (notably due to the inability to sit/stand/walk for a combined eight hours per day, the need for an unrestricted sit/stand option with frequent leg elevation, the need to accommodate unscheduled breaks and significant absenteeism, and mental limitations (see above)). The opinion is unpersuasive. The author's conclusions are not well supported by explanation (none is given for many of the limitations, including the manipulative limitations and other debilitating limitations). The conclusions are also inconsistent with the often grossly normal physical examination findings in the treatment notes and consultative exam reports, with the lack of diagnostics establishing a pathology for these excessive limitations, with the claimant's generally conservative and routine treatment history for his impairments during the period under adjudication, and with diagnostics showing improved heart functioning after recovering from the stenting procedure.

(ECF No. 4-1, PageID.63 (internal record citations omitted)).

Specifically, Plaintiff takes issue with the ALJ's "broad statements" that "offer[] nothing concrete or specific as to which evidence is not supportive of the opined limitations." (EFC No. 7, PageID.1063). But

> [t]he fact that the ALJ did not repeat or specifically cite to contrasting medical records when evaluating [the doctor's] opinion, and instead more generally referenced the record as a whole, is sufficient because the ALJ's decision is to be read as a whole. *See, e.g.*, *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 970 (6th Cir. 2021) (the ALJ's brief explanation discounting a medical opinion, in conjunction with the ALJ's discussion of the doctor's treatment notes and exam findings elsewhere in the decision, satisfied the articulation requirement for opinion evidence).

*Hamm v. Comm'r of Soc. Sec.*, No. 25-cv-423, 2025 WL 3187084, at *6 (N.D. Ohio Nov. 14, 2025), *report and recommendation adopted*, 2025 WL 3687383 (N.D. Ohio, Dec. 19, 2025); *see also Crum v. Comm'r Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why [the doctor's] opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.").

Here, the ALJ discussed the evidence of record in detail elsewhere in the opinion:

> The record shows that the claimant's heart disease and COPD restrict the claimant to a reduced range of light work with the above postural and environmental limitations. During treatment, the claimant intermittently showed signs of reduced breath sounds, chest pains, rapid

> heartbeat, and uncontrolled hypertensive blood pressures (attributed to poor medication compliance), and his treating providers classified his condition as NYHA Class II, but the claimant generally showed no signs of acute distress, malaise, or marked cardiac or breathing problems. The findings during treatment are largely congruent with those observed by the consultative examiner in June of 2024, who noted that the claimant, with respect to these impairments, essentially appeared physically unremarkable, showing no signs of acute respiratory or cardiovascular disease processes, malaise, or distress. Diagnostic laboratory tests confirmed that the claimant experienced atrial enlargement and STEMI due to severe stenosis in the RCA, but subsequent testing after the claimant recovered from stenting showed no acute cardiac anomalies and a normal LVEF. Radiographs revealed opacities in the lungs consistent with COPD and pneumonia, but no acute disease processes in the lungs. The claimant's symptoms were treated conservative and aggressive modalities, including medications (e.g., blood thinners, ACE inhibitors) and an angioplasty and stenting procedure (double) in the right coronary artery after experiencing the heart attack in 2023. However, the record shows some noncompliance with treatment (including leaving [against medical advice] from the hospital multiple times, not taking medications as prescribed, and failing to cease smoking cigarettes despite contrary medical instructions from his treating provider), which is inconsistent with the alleged severity of his impairments. And, as noted above, the diagnostics showing a normal LVEF and no acute disease processes after the claimant underwent cardiac stenting supports a finding that the claimant's condition materially improved from treatment.

(ECF No. 4-1, PageID.62 (internal record citations omitted)). When the ALJ made "broad statements" in discussing Dr. Ali's opinion that his conclusions were inconsistent with often normal physical exams, lack of diagnostics for the excessive limitations, generally conservative and routine treatment, and diagnostics showing improved heart functioning after receiving stents, he was referring to the same reasoning he had previously discussed in detail and with citations to specific record

evidence. There was thus no error. *See Mark D. v. Comm'r of Soc. Sec.*, No. 24-cv-166, 2025 WL 1656639, at *8 (E.D. Ky. June 11, 2025) ("The ALJ's explanation as to persuasiveness does not need to be lengthy, and there is no requirement that an ALJ discuss each limitation from an opinion that he adopts, or fails to adopt, when he has rejected or adopted the opinion on broader grounds." (citation modified)).

Plaintiff also argues the ALJ erred by failing to consider the consistency between Dr. Ali's opined limitations and similar limitations opined by a consultative examiner and the state agency consultant. (ECF No. 7, PageID.1063–64). But, as discussed below, the ALJ found the consultative examiner's opinion only partially persuasive and explicitly discussed that the sit/stand limitations were not persuasive. (ECF No. 4-1, PageID.64). "It would be a perversion of social security law to fault an ALJ for failing to credit two *unsupported* medical source opinions because they were *consistent* with each other." *Rattliff v. Comm'r of Soc. Sec.*, No. 10-cv-1732, 2021 WL 7251036, at *10 (N.D. Ohio Oct. 29, 2021) (emphases in original), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022).

Plaintiff argues the ALJ mischaracterized the record by saying his cardiac condition improved post stenting and ignored evidence to the contrary. (ECF No. 7, PageID.1063–66). But there is no doubt the record supports that Plaintiff's condition improved post-stenting. Numerous records show he had significantly improved after his heart attack and stenting. (*See, e.g.*, ECF No. 4-1, PageID.464, 503, 583).

Moreover, the ALJ explicitly considered that Plaintiff still experienced some chest pain and other symptoms from his heart disease and COPD and accordingly "restrict[ed] [him] to a reduced range of light work."[3] (ECF No. 4-1, PageID.62). Plaintiff does not carry his burden to show these continued symptoms were not covered by the ALJ's restriction to light work and has not shown other restrictions that were necessary in the RFC. The ALJ weighed the evidence Plaintiff cites, and substantial evidence supports the ALJ's findings; it is not for this Court to reweigh the evidence. *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. 2022) (holding plaintiff's arguments regarding the supportability and consistency factors were "veiled attempts" to circumvent the substantial evidence standard and are "classic examples of invitations to reweigh the evidence and to find other medical opinions more persuasive"); *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence).

Plaintiff also challenges the ALJ's discussion of Dr. Siva Sankaran's opinion.

---

[3] Additionally, Plaintiff himself mischaracterizes the record evidence, stating he continued to report chest discomfort in December 2024 after being prescribed a medication to prevent chest pain in September. (ECF No. 7, PageID.1064 (citing ECF No. 4-2, PageID.953)). But a more careful reading of that record shows that Plaintiff "*was* having episodes of chest discomfort. We started him on Imdur on the last visit *with an improvement* in his chest pain." (ECF No. 4-2, PageID.953 (emphases added)). Nothing else in that record indicates continued chest pain; instead, Plaintiff complained of things not at issue in this appeal including headaches and anxiety. (*Id.*). Counsel is reminded of his duties under Federal Rule of Civil Procedure 11(b)(3) to present factual contentions with evidentiary support.

In June 2024, Plaintiff presented for a consultative examination with Dr. Sankaran. (ECF No. 4-2, PageID.590–600). Plaintiff reported he has had high blood pressure since 2001, only took his medication intermittently, and was generally not very compliant in taking medication. (*Id.* at PageID.590). He specifically reported he stopped taking some of his blood pressure medication and started having chest pain every day; his doctor told him he should be back on his medication or he risked another heart attack. (*Id.*). Physical exam was generally normal including his heart, but he had elevated blood pressure and a tender neck with no restriction of motion. (*Id.* at PageID.591–92). Dr. Sankaran reviewed Plaintiff's chart and did not note anything major: "Physical examination was essentially normal." (*Id.* at PageID.592). Moreover, Dr. Sankaran did not "see any clinical evidence of peripheral vascular disease." (*Id.* at PageID.593). Dr. Sankaran nevertheless limited Plaintiff to 10 minutes of sitting, 15 minutes of standing, and carrying 25 pounds. (*Id.* at PageID.594).

Plaintiff similarly argues the ALJ's reasoning inadequately discussed the supportability and consistency factors in rejecting this opinion:

> The findings during treatment are largely congruent with those observed by the consultative examiner in June of 2024, who noted that the claimant, with respect to these impairments, essentially appeared physically unremarkable, showing no signs of acute respiratory or cardiovascular disease processes, malaise, or distress.

. . .

> The claimant was physically examined by a medical consultative examiner since the current application date, who opined that the claimant retained the ability to perform a reduced range of light work with the need to accommodate a sit/stand option. This opinion is partially persuasive. The opinion is not well supported by the author's explanation, as no explanation is given for the purported need to accommodate a sit/stand option. Moreover, the author's own essentially unremarkable findings do not support the need for such a postural limitation. However, a general restriction to light work is consistent with the claimant's aggressive treatment history for a heart attack and its potential to become exacerbated or triggered by excessive exertional activity.

(ECF No. 4-1, PageID.62, 64 (internal record citations omitted)).

As above, the ALJ's discussion incorporated his prior findings based on his review of Plaintiff's medical records. He has built an accurate and logical bridge between the evidence and his findings, and the Court has found no error in his discussion of Dr. Sankaran's opinion.

Finally, Plaintiff argues the facts here are aligned with *Russell v. Comm'r of Soc. Sec.*, No. 25-cv-640, 2025 WL 3187093 (N.D. Ohio Nov. 14, 2025), *report and recommendation adopted*, 2026 WL 27587 (N.D. Ohio Jan. 5, 2026). But this case is distinguishable. In *Russell*, "[t]he ALJ did not discuss either supportability or consistency" of one opinion, was "silent as to whether or how she evaluated the supportability" of another, and similarly failed to discuss the supportability of another, even though she used the word supportability. *Id.* at *5–*8. Here, the ALJ both used the words support and consistent *and* explicitly discussed how each challenged opinion was at least partially unsupported by the doctors' own findings

as well as inconsistent with other evidence in the record. Plaintiff has failed to show the ALJ erred or that his findings were not supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

## III. ORDER

For these reasons, Plaintiff's motion (ECF No. 7) is **DENIED**, the Commissioner's motion (ECF No. 9) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: September 25, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge